UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JONATHAN FREDRICK DILLARD,<br><br>Defendant. | Case No. 1:15-cr-00170-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

The question before the Court is whether the Defendant, Jonathan Dillard, violated the terms and conditions of his supervised release. The Court held an evidentiary hearing on July 14, 2023, and took the matter under advisement. Upon review, and for the reasons set forth below, the Court finds the Government has met its burden and that Dillard violated the terms and conditions of his release.

## II. BACKGROUND

Dillard was originally charged via Criminal Complaint on December 15, 2014. Dkt. 1. The stated offenses were: 1) receiving child pornography, and 2) possession and access with intent to view child pornography. *Id.* A special allegation that Dillard had previously been found guilty of a similar crime was included. *Id.* On July 15, 2015, a federal grand jury indicted Dillard on the same charges. Dkt. 18.

In due course, Dillard pleaded guilty (Dkt. 43) and was sentenced (Dkts. 57–59). Judge Stanley J. Bastian, sitting by designation, sentenced Dillard to 87 months

incarceration to be followed by a lifetime of supervised release. Dkt. 59.

At the outset of the COVID-19 pandemic, Dillard filed a Motion for Compassionate Release. Dkt. 65. Over the Government's objection, Judge Bastian granted Dillard's Motion (Dkt. 71), amended the judgment to reflect a sentence of time served (Dkt. 74),[1] and released Dillard onto supervised release (Dkt. 76). Supervised release commenced in May of 2020.

Dozens of motions and letters followed. On September 14, 2022, Judge Bastian declared Dillard a vexatious litigant and transferred this case back to the undersigned. Dkt. 136.

On February 1, 2023, United States Probation and Parole ("Probation") filed a Petition on Supervised Release (the "Petition"). Dkt. 137. Therein, the probation officer details four violations.

The first allegation is that Dillard violated a mandatory condition that he not commit any other federal, state, or local crime. In January of 2023, Dillard received a citation for reckless driving, a misdemeanor violation under Idaho law. The Government subsequently decided not to pursue this violation and indicated as much at Dillard's detention hearing. Dkt. 170.

Probation next asserts that Dillard violated the standard condition that he follow the instructions of his probation officer. The substance of the allegation is that Alits Counseling contacted Probation and advised that Dillard refused to sign a release of information and

---

[1] The Amended Judgment also contained certain changes to the prior terms and conditions of supervised release. These amended terms and conditions are the operative terms at issue today.

MEMORANDUM DECISION AND ORDER - 2

declined to scheduled treatment even though he had been instructed to do so.

Third, and relatedly, Probation alleges Dillard violated the term and condition that he participate in a program of mental health treatment by refusing to sign up for treatment.

Fourth, and finally, Dillard allegedly violated the special condition that he not possess or use a computer or other electronic device connected to the internet without prior permission when he accessed the internet from an unauthorized devise on two occasions.

In an Amended Petition filed May 18, 2023, Probation noted that since Dillard's Initial Appearance on February 9, 2023, he was again instructed to engage in mental health counseling, and he again failed to do so. Dkt. 165.

Dillard was subsequently arrested (Dkt. 169) and ordered detained (Dkt. 176) pending resolution of the alleged violations.

The Court was informed that Dillard intended to contest the violations in the Petition. Accordingly, the Court held an evidentiary hearing on July 14, 2023. Dkt. 180. Over the course of the six-hour hearing, twelve witnesses were called, and twenty-four exhibits were admitted. *Id*. at 2–3.

### III. LEGAL STANDARD

A term of supervised release may be revoked by the Court "if it finds by a preponderance of the evidence that the defendant violated a condition of supervised release." 18 U.S.C. Section 3583(3); *see also United States v. Lomayaoma,* 86 F.3d 142, 147 (9th Cir.1996) ("[F]or purposes of a supervised release revocation hearing, the district court need only conclude that a preponderance of the evidence supports" revocation).

Ordinarily, "there is sufficient evidence to support a conviction if, viewing the

evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of a violation." *United States v. Weber,* 320 F.3d 1047, 1050 (9th Cir.2003) (cleaned up).

The rules of evidence do not apply to evidentiary hearings related to the revocation of supervised release. Fed. R. Evid. 1101(d)(3). In *Morrissey v. Brewer*, 408 U.S. 471, 488-89 (1972), the Supreme Court ruled that during revocation hearings, defendants do not enjoy the same procedural protections provided during trial. The Supreme Court recommended a flexible process be employed "to consider evidence, including letters, affidavits, and other material, that would not be admissible in an adversary criminal trial." *Id.* at 489.

## IV. DISCUSSION

At the outset, the Court must address one argument Dillard made throughout the evidentiary hearing. This argument is also relevant to the violations having to do with his failure to attend mental health treatment.

Dillard represents that he has adult autism.[2] At the start of the evidentiary hearing, he protested moving forward based upon the notion that the procedures the Court intended to apply—that were simply its normal procedures—were not adequate for a person with his condition. He encouraged the Court to follow the processes and

---

[2] The Court notes that Judges Edward J. Lodge and Stanley J. Bastian held competency hearings in this case and ultimately determined Dillard was fit to stand trial. Dkts. 32, 37. Although Dillard had a myriad of diagnoses at that time, adult autism (or autistic spectrum disorder) was not among them. Exhibit D, presented during the recent evidentiary hearing, is a diagnostic sheet from a treatment provider dated August 31, 2022, indicating Dillard meets all the requirements for that diagnosis.

MEMORANDUM DECISION AND ORDER - 4

procedures utilized in the United Kingdom which he claims are more adaptive to persons with autism. Later that day, in a statement he read to the Court, Dillard argued that none of the Court's personnel were "educated enough" to preside over this case given his unique disability and that by proceeding, the Court was violating his constitutional rights.

As the Court stated during the evidentiary hearing, it was unable to find any authority that would allow it to consider or implement procedures utilized in a different country in this case. While those procedures are presumably helpful, the Court has no reason to apply them here.[3] And while the Court might not be an expert on Dillard's specific condition, it is an "expert" in the law, and a legal question is before the Court today. Specifically, at issue is whether Dillard violated the terms and conditions of his release, and not whether a particular procedure should be used to facilitate a hearing for an individual with Dillard's condition. The Court turns next to Dillard's alleged violations.

As noted, the first alleged violation has since been dismissed, therefore, the Court begins with violation two.

### A. Violation Two

Standard condition thirteen outlines that Dillard "must follow the instructions of the probation officer related to the conditions of supervision." Dkt. 74, at 3. Probation alleges that on March 29, 2022, Altis Counseling—Probation's usual and contracted mental health provider ("Altis")—advised that Dillard refused to sign a release of

---

[3] That said, the Court tried to give Dillard as much time during the hearing as he needed to consult with his attorney, to organize his thoughts, and to participate in his defense.

MEMORANDUM DECISION AND ORDER - 5

information ("ROI") form and that he declined to schedule treatment even though Probation had specifically instructed him to do so on March 22, 2022. Dkt. 165, at 1.

There are really two violations here. First, an ROI is critical. The primary goals of supervised release are to monitor a defendant's progress towards rehabilitation, protect the defendant (and society), and provide a defendant with resources to succeed. Various treatment programs—for mental health, drug/alcohol abuse etc.—are part of that rehabilitative process. But there is no way for Probation to know how a person is doing in their treatment if the defendant refuses to sign an ROI allowing the provider to give updates. This sharing of information is for the defendant's benefit because it allows multiple stakeholders to assess the defendant's needs and evaluate his progress. Dillard provided no explanation for his refusal to sign an ROI. This alone is a violation of standard condition three because Probation specifically asked Dillard to sign an ROI and he refused.

Moving on to the second part—which also dovetails into violation three—Dillard refused to engage in treatment. The Court will discuss the "treatment" part of this violation in the following section, but here analyzes the "disobedience" part. Based upon a long break in treatment—again, discussed more fully below—Probation gave Dillard a final and firm instruction on March 22, 2022, that he must enroll in treatment as required. Probation subsequently contacted Altis to ascertain the status of Dillard's enrollment. Altis advised that Dillard had refused to set up treatment. This is a violation because Dillard did not follow the explicit instructions of Probation.

The Court finds, by a preponderance of the evidence, that Dillard violated

MEMORANDUM DECISION AND ORDER - 6

standard condition thirteen by not following the instructions of probation.

### B. Violation Three

One of Dillard's "additional" or "special" supervised release terms is that he "participate in a program of mental health treatment, as directed by the probation officer." Dkt. 74, at 5.[4] Although Dillard originally participated in mental health treatment, he ended up withdrawing from treatment. This withdrawal appears to be based upon Dillard's perception that his treatment providers were not adequately addressing his needs. Probation contends it provided numerous referrals for other mental health treatment providers, but Dillard refused to re-engage in treatment. Dkt. 165, at 2. Probation even afforded Dillard the opportunity to find his own treatment, but he failed to do that as well. *Id*. Finally, after the Petition was filed, but before he was incarcerated, Probation gave Dillard a final chance to enroll in mental health counseling. He refused. *Id*.

The testimony during the hearing established three things conclusively. First, Dillard has been involved in treatment and counseling over the years with various providers. Second, Dillard (and Probation) have tried diligently to find providers that fit his needs. Third, Dillard believes *he* gets to choose the treatment provider and *he* believes none are qualified to meet his needs. As such, Dillard appears to have unilaterally concluded that he need not comply with his additional supervised terms until he could do so in the manner *he* desired. But Dillard's dissatisfaction with available treatment providers does not excuse him from complying with his Court-ordered terms of supervised

---

[4] These terms are not numbered. This special condition, however, is the seventh condition listed.

MEMORANDUM DECISION AND ORDER - 7

release.

By all accounts Probation went above and beyond to work with Dillard on this front. When he refused to attend Altis—because he felt he needed counseling from someone who had experience working with adult autism—Probation allowed Dillard to search for a provider of his choosing. But Probation asked that during the interim, Dillard attend Altis so that he had support. And Probation wasn't alone in its efforts. Dillard provided evidence that he called numerous treatment providers to inquire about services. The problem with all of this, however, is the requirement is not that Dillard simply "inquire," "search out," or "schedule" treatment; he must actually "participate" in treatment. Dkt. 74, at 5.

The Court circles back to the concerns Dillard raised about the procedures used during the evidentiary hearing. Like his concerns with the hearing, Dillard has apparently expressed concern all along that none of the local treatment providers are qualified to treat a person with adult autism. Because of this, Dillard contends, attending treatment is not effective. Dillard persuasively elicited testimony that adult autism is unique and that some providers are not trained to treat this specific disorder. He also illustrated the lack of providers with that specialized training in the Treasure Valley.

The Court has two concerns.

First, this is not a situation where, metaphorically speaking, a patient with a hand injury is being forced to go to a foot doctor. There are local providers qualified to treat Dillard. Although such providers may not be experts in adult autism, they are capable of treating Dillard's other disorders, and providing mental health treatment, even considering

his adult autism. For example, as Marcy Peters from Calm Waters Counseling explained, she has multiple patients with autism, and she effectively treats them and their disorders even though she is not an autism specialist. Erik Malm of GPS Psychology and Anxiety Clinic—the clinic that diagnosed Dillard with adult autism—also testified that while their facility does not *specialize* in adult autism, they do treat patients who have that disorder.

This testimony is important because Probation specifically told Dillard that he could try to find a specialist in adult autism, but he needed to remain in counseling in the interim. Dillard's approach, however, was apparently "a specialist or nothing." The problem, however, is that Dillard cannot escape the terms of supervised release by rejecting available providers just because those providers are not qualified in his mind. This leads to the Court's next concern.

Second, Dillard does not get to pick what kind of treatment *he* thinks he needs. Probation has been very patient. They gave Dillard an extended period to follow-up in the manner *he* desired and to try and find a treatment provider *he* wanted. The probation officer testified she even gave Dillard a list of providers who specialized in autistic disorders so that he could follow up. And by all accounts he did. He was trying to get treatment, he was trying to access services, he was trying to get the help he needed. But none of those efforts bore fruit.

The last time Dillard was actively engaged in mental health treatment was March of 2022. The Petition was filed in February of 2023. Probation worked with Dillard for almost a year to try to find a mental health provider he would accept. But Probation cannot simply ignore a term of probation indefinitely because the Defendant is trying to figure

out what works for him. That is not how terms and conditions work. The Court understands there may be treatment providers who have more expertise in adult autism. The Court also understands that Dillard, along with others, were trying to actively locate those individuals and that doing so took time.[5] Again, however, for this term of supervised release, the *type* of treatment is secondary to simply being enrolled in treatment.

Dillard could have fully complied with this term of his probation by attending treatment—any treatment—while simultaneously looking for a specialist. He does not get to avoid a term and condition or release simply because he does not think the treatment is specifically tailored to his needs. Dillard's Probation Officer testified that if Dillard would have engaged in any treatment, she would have dropped this violation. In fact, after the Petition was filed, she gave him a final opportunity to comply. He did not take it.

In sum, the Court finds, by a preponderance of the evidence, that Dillard violated this special condition by not "participating" (i.e. being enrolled in) treatment when he was specifically told to do so, and only after having been given almost a year to find treatment he deemed satisfactory.

### C. Violation Four

Another of Dillard's special supervised release terms deals with his use of electronic devices and computer monitoring. The Petition uses different wording from the

---

[5] Probation clearly understood this. It did not seek to revoke Dillard's supervised release right away simply because it was taking time to find treatment. Not only were there delays because Dillard wanted a specialist, but there were delays because of the COVID-19 pandemic and the natural delays of scheduling medical appointments. Probation considered such delays and gave Dillard ample time to find treatment. He failed to do so.

MEMORANDUM DECISION AND ORDER - 10

Amended Judgment. That is, in part, because Probation has updated the verbiage as it relates to these types of conditions since the Amended Judgment was entered. Specifically, the language has been consolidated and states that permission to possess or use an electronic device must be given "in writing." There are other minor language variations as well. The Court will, however, use the language from Dillard's Amended Judgment.

Special condition four states that Dillard may not possess or use a computer without prior permission. Dkt. 74, at 5. Special condition five states he shall comply with the requirements of Probation's Computer Monitoring Program as directed and that Probation may conduct ongoing monitoring of his electronic devices. *Id*. The nineteenth special condition states that Dillard shall have limited access to the internet as approved by his probation officer. *Id*. at 6.

Probation alleges that Dillard accessed the internet from an unauthorized smartphone in November of 2023, and from an unauthorized desktop computer on January 5, 2023. Dkt. 165, at 2.

The main dispute here lies in the testimony of witnesses and boils down to this: members of Dillard's family thought that he could have access to the internet—even potentially without monitoring software—because 1) his probation officer purportedly told him that, and 2) his probation officers allegedly "knew" he had a phone that had internet access and never confiscated it (i.e. he had implied permission). The testimony from Dillard's family, however, was not consistent and does not clearly lead to the result Dillard appears to advocate.

MEMORANDUM DECISION AND ORDER - 11

For instance, Dillard's brother Dan testified that his understanding was that Dillard could have a phone. He was unaware of whether the phone could have internet access. He stated *Dillard* believed he could have a phone with internet access, but he himself did not know if such was actually permitted under the terms of Dillard's supervised release. Dan also testified that his understanding was that Dillard's probation officers did not have the authority to authorize monitoring software, while somewhat conflictingly stating Probation explained to him on at least one occasions that if Dillard wanted the internet, he could have access to it so long as the monitoring software was approved and installed.

Dillard's sister testified that Dillard's prior probation officer said he could have a phone knowing it had internet capabilities. She also said that Dillard took out a phone in the presence of his probation officer, it was not confiscated, and at a later time, even after Probation took Dillard's phone to review it, they gave it back—both times knowing the phone could access the internet.

Like the testimony from Dan's sister, a lot of the testimony from Dillard's other family members focuses on the fact he had a phone. But owning an unauthorized phone was only part of the problem; accessing the internet without permission and without monitoring software was the bigger issue.

Probation is adamant that it did not, at any time, provide affirmative permission for Dillard to possess a cell phone with internet access. Additionally, just because Probation returned a phone to Dillard that *could* access the internet does not mean he was, therefore,

*allowed* to do so.⁶ Furthermore, the evidence is not clear Probation was ever aware Dillard's phone could access the internet.

At some point prior to November 3, 2022, Dillard appears to have thought, for whatever reason, that he could have internet access because he had a phone with that capability. Probation strongly denies anyone ever gave him such permission. Regardless, Probation confiscated his phone on that date and reviewed it. They did not find any unlawful material and returned the phone. However, recognizing Dillard's need to have internet access to address his medical issues, Probation approved Dillard to receive access to the monitoring software. He was then approved from November 7, 2022, through December 23, 2022. Unfortunately, issues persisted with Dillard's electronic devices. It appears they were not compatible with the monitoring software. Ultimately, Probation told Dillard he was not going to be able to have the monitoring software and that he could not use unmonitored electronic devices. On January 11, 2023, Dillard admitted that he accessed an unauthorized and unmonitored desktop computer on January 5, 2023.

The testimony on this particular violation is somewhat confusing. It seems clear that Probation never gave *formal* authorization or permission for Dillard to have a cell phone that could connect to the internet. But there are some gaps in the evidence that lend support to the idea that there was some type of implied permission.⁷ Whether the

---

⁶ Afterall, in this day and age, it would be hard to find a phone that *did not* have internet capabilities.

⁷ For example, if Probation had previously seen Dillard with a phone, why did they allow him to keep it without checking whether it had internet access to ensure it was a compliant device? In like manner, when they reviewed his phone in November 2022, presumably Probation observed it could access the internet.

(Continued)

MEMORANDUM DECISION AND ORDER - 13

confusion lies with the testimony and explanation (from witnesses and counsel), or the understanding and interpretation (on the Court's end), it is of little consequence because, even assuming arguendo that the Court were to disregard the alleged violation as it relates to the cellphone—because of concerns about implied consent—the alleged violation as to the computer would still be sufficient to uphold a finding that a violation occurred. It is clear from the record that Probation told Dillard on or around December 23, 2022, that the monitoring software was not going to work with his devices and that he was not allowed to use unmonitored electronic devices. He used an unmonitored electronic device after that time.

Setting aside the confusion surrounding the cellphone, this much is clear: the special condition allows for "limited access to the internet *as approved by [probation]*." Dkt. 74, at 6 (emphasis added). Probation has represented it gave no such approval, and Probation specifically advised Dillard, on or about December 23, 2022, that he could not use those devices anymore because they were incompatible with monitoring software. He accessed one (or more) devices after that explicit warning.

In sum, while the evidence may not prove the violation beyond a reasonable doubt or to the clear and convincing standard, neither is required. The Government's burden is to establish a violation by a preponderance of the evidence. *See Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 404 (9th Cir. 1996) (describing the

---

They returned the cellphone anyway. To be sure, Probation immediately began efforts to get Dillard the monitoring software, but it seems odd to return a phone to him that had internet capability *before* the software was installed. Perhaps this is the normal procedure, but this issue was not fleshed out at the hearing.

MEMORANDUM DECISION AND ORDER - 14

preponderance standard for establishing a fact as "more likely than not"). The Government has met this standard by showing that Dillard more likely than not accessed the internet via unauthorized and unmonitored devices in violation of the special conditions of his release.

## V. CONCLUSIONS

The Court has considered the testimony and the exhibits presented during the evidentiary hearing, and makes the following conclusions based upon a preponderance of the evidence.

1. Dillard was placed on supervised release in May of 2020. Standard Condition thirteen requires Dillard t to follow the instructions of Probation. Dillard did not do this. Although instructed to do so by Probation, Dillard failed to sign an ROI and he failed to sign up for mental health treatment.

2. Special condition seven requires Dillard to "participate" in mental health treatment. Dillard initially did so, but then withdrew in an effort to find more specialized treatment. Probation patiently waited and assisted Dillard with these efforts. After almost one year without treatment, however, Probation told Dillard he needed to be enrolled in mental health treatment. He failed to comply.

3. Special conditions four, five, and nineteen place certain restrictions on Dillard's use of electronic devices. Dillard failed to comply with such conditions, most notably by admittedly using an unauthorized and unmonitored desktop computer on January 5, 2023.

4. In sum, the Court finds the Government has met its burden as to violations

MEMORANDUM DECISION AND ORDER - 15

two, three, and four.

## VI. ORDER

IT IS HEREBY ORDERED that:

1. The Government has met its burden as to violations two, three, and four. The Court finds that Dillard has violated the conditions of supervision in the manner set forth above.

2. This matter is set for a Final Revocation Hearing on **Wednesday, August 16, 2023, at 1:00 p.m.** at the U.S. Courthouse in Boise, Idaho.

DATED: July 31, 2023

_____
David C. Nye
Chief U.S. District Court Judge